## Case No. 9,173.

MARTINETTI et al. v. MAGUIRE et al.

MAGUIRE et al. v. MARTINETTI et al.

[Deady, 216; 1 Abb. U. S. 356.] [1]

Circuit Court, California. April 20, 1867. [2]

THEATRES AND SHOWS—INJUNCTION—COLORABLE IMITATION—DRAMATIC COMPOSITION—INDECENT CHARACTER.

1. Where a party seeks to enjoin another from the exhibition or performance of a spectacle or dramatic composition, he must show an exclusive right in himself to the use of such spectacle or composition, before his application will be allowed.

2. Where two spectacles, called respectively the "Black Crook" and the "Black Rook" produced the impression upon those who witnessed them that they were substantially the same: *held*, that one was a colorable imitation of the other.

3. The act of August 18, 1856 (11 Stat. 138), which gives "the proprietor of a dramatic composition, designed or suited for public representation, the sole right to represent the same, does not include a mere exhibition, spectacle or arrangement of scenic effects having no literary character—the same not being a "dramatic composition" within the meaning of the act.

4. The act aforesaid purports only to apply to dramatic compositions "suited to public representation," and therefore it ought not to be construed to protect the proprietor of a composition of an immoral or indecent character, in the exclusive right to represent the same.

5. In the exercise of its power to secure "to authors and inventors the exclusive right to their respective writings and discoveries" (Const. art. I, § 8, subd. 8), congress may discriminate in favor of good morals, and against vice.

[Cited in Hockett v. State, 105 Ind. 256, 5 N. E. 178.]

6. The power aforesaid is conferred on congress, not generally, but only as a means to this particular end—"To promote the progress of science and useful arts"—therefore, it seems that it does not extend to writings of a grossly immoral or indecent character, or to inventions expressly designed to facilitate the commission of crime.

The complainants in [Julian] Martinetti and others against [Thomas] Maguire and others brought suit to enjoin the defendants therein from performing or exhibiting a play or spectacle, called by them the "Black Crook," alleging that the same was a mere colorable imitation of a play known as the "Black Rook," which is the property of the complainants. Thereupon, Maguire and others brought suit against Martinetti and others, to enjoin the latter from performing a play called by defendants the "Black Rook," alleging that the same was a mere colorable imitation of a play known as the "Black Crook," which is the property of said complainants.

Upon the filing of the bills, the complainants in each suit gave notice of an application to the court for a provisional injunction, as prayed for in the bill, until the final hearing. By consent of parties, the motions were heard together, upon the bills and evidence taken at the hearing.

Hall McAllister, for Martinetti and others.

Alexander Campbell, for Maguire and others.

DEADY, District Judge. The bill of the complainants, Martinetti et al., charges, that on October 17, 1866, at New York City, one James Schonberg composed and copyrighted a dramatic composition called the "Black Rook," and then and there assigned the same exclusively to complainants; that complainants are the proprietors of the Metropolitan Theatre, in San Francisco, and are about to produce on the stage thereof said play of the Black Rook; that the defendants, Maguire et al., by improper means procured a manuscript copy of the Black Rook from an employee of complainants, and is exhibiting the same at the theatre of said defendants, Maguire's Opera House, in San Francisco, to the injury of complainants; and that defendants before making such exhibition, changed the name of said play to the Black Crook, and also changed the names of the characters, and made some slight alterations in the dialogues and incidents thereof.

The bill of the complainants, Maguire et al., charges, that about July 1, 1866, one Charles M. Barras, of New York City, composed a dramatic composition called the Black Crook, and copyrighted the same; that said play was exhibited at Niblo's Theatre in New York, early in September, 1866, and continuously since that date, for the benefit of and with great gain to the author; that about March 25, 1867, the complainants became the exclusive assignee of the right to exhibit the Black Crook in the state of California, and in pursuance of such assignment, and by virtue of such right, are now exhibiting the same at Maguire's Opera House aforesaid; that during the exhibition of the Black Crook at Niblo's, as aforesaid, the defendants procured a copy of the same by employing one Schonberg, or other person, to attend such exhibition and take down the parts in shorthand, as they were spoken and acted by the players; and that the defendants are now about to exhibit such play from the copy so obtained. at the Metropolitan Theatre aforesaid, under the name of the Black Rook, to the damage of the complainants.

A number of witnesses have been examined on either side as to the identity of the plays. So far as I can judge from the evidence, the plays are identical. One of them must be a mere colorable imitation of the other. The triking similarity in the names—Black Crook and Black Rook—is enough of itself to suggest that the one is an imitation of the other. All the disinterested witnesses who have been present at the exhibition of the Black Crook at Niblo's and Maguire's agree in stating that they thought the plays the same. It is admitted and charged by Martinetti, that the

---

[1] [Reported by Hon. Matthew P. Deady, District Judge, and by Benjamin Vaughan Abbott, Esq., and here compiled and reprinted by permission.]

[2] [District not given.]

play now on exhibition at the opera house is substantially the play which he calls the Black Rook, and claims to be the proprietor of. For the purpose of the comparison, let it be assumed that the Black Rook is being played at Maguire's Opera House, and the Black Crook at Niblo's. Whatever may be the technical differences in the exhibitions at these two places, if the result is so nearly the same as to produce the impression that they are identical upon ordinary spectators, it seems to me that as a question of fact, one ought to be held a mere colorable imitation of the other. A play like this has no value except as it is appreciated by the theatre-going public. It cannot be read—it is a mere spectacle, and must be seen to be appreciated. If the similarity in general character and effect between the alleged imitation and original, is sufficient to deceive the public who ordinarily witness such exhibitions, it is fair to conclude that the one is a piracy of the other.

Which, then, is the original, and which is the imitation? The respective dates of their composition seem to furnish a satisfactory answer to this question. It is admitted that the Black Crook was composed and copyrighted in the early part of July, 1866, while it is not claimed that the Black Rook was composed earlier than the middle of the October following—and after the former had been exhibited at Niblo's for at least six weeks. Unless both are original compositions or contrivances—unless this striking similarity between them is a mere coincidence, I must conclude that the Black Crook is the original, and the Black Rook the imitation or copy. As neither of these spectacles have any substantial claim to originality, I suppose the coincidence is possible. But such coincidence is not probable, while all the other circumstances of the case point to but one conclusion—that the manuscript of the so-called Black Rook, procured in New York by Martinetti from Schonberg, was a mere colorable imitation or copy of the Black Crook, obtained by improper means or without authority of the proprietors.

Whether Martinetti knew this fact at the time or since, is immaterial. In any view of the matter, he has only the same right in the premises that Schonberg would have, if he were now the party before the court. Under the circumstances disclosed by the evidence, the reasonable inference is, that Martinetti did not purchase the Black Rook, believing it to be an original composition of that name, but rather that he employed Schonberg, or some other, to procure a copy of the Black Crook, to which, after making some unessential changes upon it, he gave the name of Black Rook. No evidence is produced of the alleged purchase of the Black Rook, except the allegation to that effect in the bill. If Martinetti had purchased an original composition, or what he believed to be such a composition, called the Black Rook, which had been copyrighted by the author, it is reasonable to infer that he would have taken an assignment of the latter's right to himself, and have produced it here in evidence or accounted for its absence. The omission to do this tends strongly to disprove the allegation of a purchase from Schonberg by Martinetti.

On the other hand, it is admitted that Maguire has the legal right to exhibit the Black Crook in California, and also that the present exhibition at the Opera House, is being made, not from the copy obtained from the author at the time of the assignment by him to Maguire, but from a copy of the manuscript which Martinetti alleges that he obtained from Schonberg; and that Maguire's copy is now on the way here from New York.

Martinetti's copy being prior in point of time to the assignment to Maguire, if it had been obtained by legitimate means, he would have the legal right to make an exhibition or representation of the play from such copy as against the author or his subsequent assigns. In that case, such copy would be the literary property of Martinetti, and the obtaining of a copy of this manuscript by improper means —without the consent of Martinetti—would be a fraud upon him. The purchase of this copy by Maguire's manager from Martinetti's employee—McCabe—was made under such circumstances, that he did not acquire any right thereby as against the lawful proprietor of the original. At the time of the sale McCabe declined to tell when, where, or how he got the copy. Maguire's manager then knew that the Martinettis were rehearsing the spectacle set down therein. The manager from these and other circumstances had good reason to believe that he was purchasing stolen property; and whether he believed so or not, as such was the fact, the effect is the same.

But Martinetti had no literary property in the copy which he obtained from New York. By literary property, of course, I mean property in the composition, and not in the mere paper. The Black Rook, or manuscript in the possession of Martinetti, was itself a plagiarism of, or a slightly disguised copy of, the Black Crook. This being so, it was stolen property in the same sense that the copy was which McCabe sold to Maguire, and therefore Martinetti has no literary property in it. He is neither the author, assignee or donee of the play or the manuscript of it. For this reason, I am clear that he cannot enjoin Maguire from the use of his copy, however obtained. In this respect, both parties are wrong-doers and in pari delicto.

More than this, I suppose that the owner of a play who finds that a colorable imitation of it, or a true copy surreptiously obtained, is in the hands of a third person, may purchase the same, even if he should know at the time that the person from whom he is purchasing has obtained it from another improperly. This may be the easiest and cheapest way of protecting his rights as owner. In effect he is only buying his own prop-

erty—or buying his peace instead of going to law.

This, I believe, disposes of all the grounds on which the complainants—Martinetti et al. —rely for an injunction, and their motion must, therefore, be denied, with costs.

On the other hand, if this play is a "dramatic composition," within the purpose and meaning of the act of congress (4 Stat. 436; 11 Stat. 138), the motion of the complainants —Maguire et al.—for an injunction against Martinetti et al. should be allowed. But as at present advised, I do not think it such a composition. All the witnesses agree—particularly the experts—that the so-called play of the Black Crook has no originality, and that it consists almost wholly of scenic effects, or representations taken substantially from well known dramas and operas. The evidence of W. B. Hamilton, the stage-manager of the Metropolitan, is explicit and satisfactory on that point. He has been an actor since 1828, in both Europe and America. He appears to be well informed in what pertains to his profession, and impressed me with his fairness and candor.

The Black Crook is a mere spectacle—in the language of the craft a spectacular piece. The dialogue is very scant and meaningless, and appears to be a mere accessory to the action of the piece—a sort of verbal machinery tacked on to a succession of ballet and tableaux. The principal part and attraction of the spectacle seems to be the exhibition of women in novel dress or no dress, and in attractive attitudes or action. The closing scene is called Paradise, and as witness Hamilton expresses it, consists mainly "of women lying about loose"—a sort of Mohammedan paradise, I suppose, with imitation grottos and unmaidenly houris. To call such a spectacle a "dramatic composition" is an abuse of language, and an insult to the genius of the English drama. A menagerie of wild beasts, or an exhibition of model artistes might as justly be called a dramatic composition. Like those, this is a spectacle, and although it may be an attractive or gorgeous one, it is nothing more. In my judgment, an exhibition of women "lying about loose" or otherwise, is not a dramatic composition, and, therefore, not entitled to the protection of the copyright act. On this ground, the application of Maguire et al. for an injunction is denied, with costs.

But, further, the act of congress provides that a "dramatic composition" to be entitled to be copyrighted, must be "suited for public representation." What is intended by the word "suited?" Simply that the composition is technically adapted to the stage, and capable of being produced upon it? While it means this, I am inclined to think it means something more; that to be suited to public representation, it must be fit to be represented. I do not for a moment suppose or pretend that congress has the power to interfere directly and prescribe a standard of good

morals on this subject. But the benefit of copyright is a privilege conferred by congress in pursuance of the constitution of the United States. In conferring this privilege or monopoly upon authors and inventors, I suppose that it is both proper and constitutional for congress so to legislate, as to encourage virtue and discourage immorality.

Congress has power "to establish an uniform rule of naturalization." Const. art. 1, § 8, subd. 4. In exercising this power, it has always discriminated in favor of morality, by providing that on the hearing of the application for citizenship, the applicant must prove that for five years prior to such application, "he has behaved as a man of good moral character." 2 Stat. 154.

Besides, the power to pass what are called copyright and patent laws, or as the constitution expresses it, to secure "for limited times to authors and inventors the exclusive right to their respective writings and discoveries," is given not generally, but only as a means to this particular end—"to promote the progress of science and useful arts." Const. art. 1, § 8, subd. 8. Hence, it expressly appears that congress is not empowered by the constitution to pass laws for the protection or benefit of authors and inventors, except as a means of promoting the progress of "science and useful arts." For this reason, an invention expressly designed to facilitate the commission of crime, as murder, burglary, forgery or counterfeiting, however novel or ingenious, could not be patented. So with a dramatic composition which is grossly indecent, and calculated to corrupt the morals of the people. The exhibition of such a drama neither "promotes the progress of science or useful arts," but the contrary. The constitution does not authorize the protection of such productions, and it is not to be presumed that congress intended to go beyond its power in this respect to secure their "authors and inventors the exclusive right" to the use of them. Upon this ground, I very much doubt whether the spectacle of the Black Crook is entitled to the benefit of copyright, even if it were admitted that it was a "dramatic composition."

In considering these questions, this court does not pretend to be the conservator of the public morals in this respect. That is a matter for the local legislature. But in giving construction to the constitution and laws, when legitimately called upon to do so, it is the duty of all courts to uphold public virtue, and discourage and repel whatever tends to impair it. Now, it cannot be denied that this spectacle of the Black Crook only attracts attention as it panders to a prurient curiosity or an obscene imagination by very questionable exhibitions and attitudes of the female person. True, the lawfulness of such an exhibition depends upon the law of the place where it takes place. But when the author, inventor or proprietor thereof asks the power of this court to protect him in the exclusive

right to make such an exhibition under the copyright act, the matter assumes a very different aspect. I am strongly impressed with the conviction that an injunction should not be allowed in this case on the ground that the Black Crook is not "suited for public representation"—not fit to be exhibited—within the meaning of the act of congress; and on the further ground that it is not within the scope of the power granted to congress to protect the authors or inventors of such exhibitions in "the exclusive right" to the use of them, as they neither promote the progress of science or useful arts.